Electa Ruth Bennett also known as Ruth E. Bennett v. Commissioner. Electa Ruth Bennett also known as Ruth E. Bennett and Chester Bennett v. Commissioner.
Bennett v. Commissioner
Docket Nos. 49637, 49638.
United States Tax Court
T.C. Memo 1956-34; 1956 Tax Ct. Memo LEXIS 261; 15 T.C.M. (CCH) 150; T.C.M. (RIA) 56034; February 15, 1956
*261 Charles F. Hartsock, Esq., Carew Tower, Cincinnati, Ohio, for the petitioners. Robert E. Johnson, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined income tax deficiencies and additions to the tax as follows: Electa Ruth Bennett, Docket #49637
Electa Ruth Bennett and Chester Bennett,
Docket #49638
Dkt.
Additions to Tax
No.
Year
Deficiencies
Under Sec. 293(b)
49637
1944
$ 5,190.26
$ 2,595.13
1945
20,336.16
10,168.08
49638 *
1946
18,020.56
9,010.28
1947
16,450.44
8,225.22
1948
10,747.26
5,373.63
1949
3,953.60
1,976.80
The issues for decision are whether, during the years 1944 through 1949, Ruth received income from the sale of stolen merchandise which she failed to report in her income tax returns and whether any part of each deficiency was due to fraud with intent to evade tax under the provisions of section 293(b) of the Internal Revenue Code of 1939. Findings of Fact Ruth Bennett filed her individual income tax returns for the years 1944 and 1945 and she and Chester, her husband, filed *262 joint income tax returns for 1946 through 1949, with the collector of internal revenue for the first district of Ohio. Adjusted gross income and net income were shown on those returns as follows: Adjusted
Year
Gross Income
Net Income
1944
($ 487.13)
1945
2,397.43
$1,973.09
1946
1,413.18
810.00
1947
2,326.20
1,790.39
1948
(768.54)
1949
2,112.87
Ruth, after working as a clerk for a paper company and in the adjustment office of Sears Roebuck, was employed in 1935 by a hardware company in Cincinnati. She kept books and clerked in that store until January 1944. She opened her own hardware store in 1944 under the name of "R. L. Hardware & Supply Co." She sometimes obtained enamel ware, then in short supply, from Alex Bell. Mathias Schira was employed from 1908 to 1950 by the Cincinnati Galvanizing Company as shipping clerk. He was aided by several men in loading the trucks which delivered the company's galvanized products. That company manufactured buckets, tubs, cans and other galvanized merchandise which were stored in the company's warehouse and loaded by Mathias on shipping orders from William Schott, Vice President, or from John Heizel, the *263 plant superintendent. Ruth and Mathias joined in a scheme during all of the taxable years pursuant to which Mathias diverted galvanized merchandise from his company's warehouse, which Ruth received and sold. Ruth and Mathias shared equally in the proceeds from such sales. Substantial amounts were received by each in each taxable year involved herein. The method of operation was that several times a week Mathias would load, or have loaded, galvanized ware into the 1 1/2 ton truck of Louis Miller, a contract trucker for the Cincinnati Galvanizing Company. Miller would haul that merchandise to a building in another part of the city where Ruth was usually waiting, and where the merchandise on the truck was delivered to Alex Bell, generally by direct transfer onto Bell's truck. No shipping tickets or other memoranda accompanied those deliveries. Ruth at first paid Miller $5, later $10 and finally $15 for each load hauled by him. Ruth gave Miller, at the time of each delivery, a tied package containing cash in payment for the previous delivery, to give to Mathias. Miller delivered the packages to Mathias without opening them. Mathias never opened those packages in Miller's presence. *264 Bell had never met and had no direct dealings with Mathias during the time he was buying the galvanized ware from Ruth. Bell paid Ruth by cash in the earlier years and by check beginning in June 1947. The amounts of merchandise hauled were as great during the earlier years as during the later years. The checks were in payment for the merchandise obtained through Mathias and were drawn on the account of Bell or his company, the Norwood Express & Drayage Co., payable to the R. L. Hardware & Supply Co., as follows: Number
Amount
Date of Check
of Check
of Check
(Year 1947)
Checks drawn on the account of
Alex Bell at the Lincoln Na-
tional Bank, Cincinnati, Ohio.
June 14
1475
$ 700.00
18
1476
585.00
Checks drawn on the account of
the Norwood Express and Dray-
age Co. at the Lincoln National
Bank, Cincinnati, Ohio.
June 29
132
800.00
July 3
135
800.00
8
138
800.00
25
143
600.00
29
144
684.50
Aug. 1
164
595.15
2
145
600.00
3
190
700.00
6
146
600.00
6
162
850.00
15
160
750.00
17
161
750.00
19
163
500.00
21
166
800.00
26
167
800.00
Sept. 4
168
720.81
11
181
735.30
17
183
750.00
20
182
760.00
25
189
700.00
27
188
723.80
Oct. 2
193
900.00
10
194
900.00
17
195
899.60
18
204
800.36
23
202
900.00
29
203
900.00
Nov. 4
207
$ 700.00
10
208
700.00
14
209
569.60
17
210
700.00
20
214
588.90
25
215
700.00
Dec. 5
223
412.97
12
224
600.00
18
225
393.50
20
226
700.00
24
227
700.00
27
230
594.60
29
228
800.00
Total for year 1947
$29,764.09
(Year 1948)
Checks drawn on the account of
the Norwood Express and Dray-
age Company at the Lincoln Na-
tional Bank, Cincinnati, Ohio.
Jan. 3
231
$ 700.00
8
232
700.00
12
236
500.70
14
233
600.00
15
237
500.00
17
238
500.00
22
239
500.00
26
240
500.00
30
241
632.40
Feb. 3
242
500.00
5
247
606.40
7
243
500.00
9
248
500.00
10
244
400.00
13
249
500.00
14
245
600.00
16
250
500.00
20
251
500.00
Mar. 1
256
692.30
6
257
750.00
10
258
650.00
13
259
500.00
15
263
765.99
17
260
500.00
19
264
750.00
25
265
750.00
29
267
632.60
April 1
271
500.00
1
278
622.00
5
272
500.00
5
279
500.00
9
273
500.00
10
280
500.00
13
274
500.00
14
281
500.00
20
282
500.00
23
285
502.45
27
287
500.00
May 1
289
650.00
6
290
500.00
8
286
650.00
10
288
700.00
20
291
500.00
24
292
747.50
28
293
700.00
June 1
294
700.00
4
296
600.00
5
295
500.00
10
297
451.48
14
298
$ 500.00
18
301
500.00
21
299
500.00
22
300
500.00
Checks drawn on the account of
Bell and Company at the Lin-
coln National Bank, Cincinnati,
Ohio.
June 21
1726
626.00
25
1727
500.00
30
1728
500.00
July 2
1729
500.00
3
1736
752.20
9
1730
500.00
9
1737
500.00
14
1738
500.00
20
1752
691.45
24
1753
600.00
29
1754
600.00
Aug. 3
1755
600.00
7
1761
596.20
10
1762
600.00
16
1763
500.00
21
1764
500.00
21
1771
759.05
25
1772
500.00
26
1767
500.00
28
1773
500.00
Sept. 4
1774
500.00
4
1789
590.85
7
1790
500.00
11
1791
500.00
13
1775
500.00
15
1792
500.00
18
1793
500.00
20
1795
736.70
24
1796
500.00
29
1797
500.00
Oct. 4
1808
535.65
8
1809
500.00
14
1810
500.00
20
1820
232.25
25
1821
718.40
25
1822
500.00
30
1823
500.00
Nov. 4
1829
714.50
10
1830
500.00
16
1831
500.00
17
1837
744.50
22
1838
500.00
27
1839
500.00
Dec. 1
1850
783.85
6
1851
500.00
11
1852
500.00
16
1853
321.40
20
1854
500.00
22
1865
538.11
27
1866
500.00
30
1871
642.60
30
1872
600.00
31
1867
500.00
Total for year 1948
$59,037.53
(Year 1949)
Checks drawn on the account of
Bell and Company at the Lin-
coln National Bank, Cincinnati,
Ohio.
Jan. 3
1877
$ 770.70
10
1878
500.00
17
1879
500.00
20
1884
748.70
24
1885
500.00
31
1886
500.00
Feb. 3
1887
500.00
16
1893
418.15
23
1894
400.00
25
1895
518.00
28
1896
500.00
Mar. 1
1905
500.00
7
1903
500.00
11
1904
500.00
14
1918
350.50
16
1906
595.08
18
1919
500.00
23
1920
500.00
29
1921
500.00
April 4
1922
500.00
11
1923
500.00
15
1924
500.00
18
1929
673.85
22
1930
500.00
26
1931
500.00
30
1932
500.00
1933
500.00
May 11
1941
752.90
12
1934
500.00
14
1942
500.00
17
1935
500.00
20
1943
500.00
25
1944
500.00
31
1945
500.00
June 4
1946
500.00
8
1947
500.00
10
1948
500.00
15
1949
500.00
17
1958
788.39
2?
1959
500.00
27
1960
500.00
30
1961
500.00
July 5
1962
500.00
9
1963
500.00
12
1964
500.00
15
1967
510.80
18
1970
500.00
19
1968
500.00
22
1969
500.00
23
1972
500.00
25
1971
500.00
28
1973
500.00
28
1975
352.00
30
1976
500.00
Aug. 3
1977
500.00
15
1980
500.00
25
1979
770.60
Sept. 1
1981
500.00
7
1982
500.00
12
500.00
22
465.60
Total for year 1949
$31,615.27
*265 Bell also gave Ruth some much smaller checks in payment for occasional purchases of hardware from her store. Neither Ruth nor her R. L. Hardware & Supply Co. kept any records of the checks or amounts received from Bell or the amounts of currency sent to Mathias. George Schott, secretary of the Cincinnati Galvanizing Company, attended an industry meeting in Chicago in 1949 where he was informed of the sale of merchandise bearing the markings of his company at prices which he thought were not possible. The sale was verified and the Cal Crim Detective Bureau was called in to make an investigation. The investigation disclosed that the purchases were being made from Bell, who was obtaining the merchandise from Ruth and Mathias. The total amount of merchandise thus taken could not be established from the company's antiquated system of inventory and record keeping. William Schott, Vice President of the Cincinnati Galvanizing Company, and one of the detectives employed by the company questioned Mathias about what had been going on and as a result Mathias, on October 8, 1949, freely and without duress, admitted participating in the operation and receiving approximately $35,000. Thereafter *266 he paid $35,000 to the Cincinnati Galvanizing Company and received on October 14, 1949, a release and receipt from it. Mathias continued in the employ of the company and came to William Schott on October 17, 1949, saying he wanted to make a clean breast of it and tell the entire truth. Mathias then disclosed details of the conspiracy and its operation over a period including all of the taxable years in question, involving much larger amounts than those referred to in his earlier statement. Thereafter Ruth and her husband sought out Mathias, who told them of his statements, of the payment and of the release, whereupon Ruth said, "I ain't going to give them nothing if they put me in jail," and her husband said, "You don't have to go to jail, I go in the jail for you." Agents of the Commissioner examined books of the R. L. Hardware & Supply Co. on October 4, 1949, at which time Ruth revealed to them that she had 1 bank account and 1 safety deposit box. They later learned from other sources that she and her husband had another safety deposit box at a different bank and that it had been entered on October 4, 1949. Both boxes were opened on October 25, 1949, in the presence of the agents. *267 The boxes then contained only a few bonds of the total face amount of about $450. The sale of merchandise of the R. L. Hardware & Supply Co. for the years 1944, 1946, 1947, 1948 and 1949 were understated on its books and on Ruth's returns in the respective amounts of $1,284.34, $1,376.43, $6,458.22, $4,187.44 and $4,294.96 (not including sales of the wares taken from Cincinnati Galvanizing Company and sold to Bell.) The Commissioner, in the deficiency notices, determined that Ruth's income was understated by reason of the above understated sales of merchandise of the R. L. Hardware & Supply Co. and also determined that her income for the years 1944 to 1949, inclusive, was understated in the respective amounts of $11,960, $30,160, $29,475, $25,688, $27,568.77 and $12,582.64 because of unreported profits realized from the sales of the galvanized ware, none of which had been reported by her. The evidence fails to show that Ruth did not receive income during the years 1944 through 1949 in the amounts determined by the Commissioner. A part of the deficiency for each of the years 1944 and 1945, as determined against Ruth and for each of the years 1946 through 1949, as determined *268 against Ruth and her husband, was due to fraud with intent to evade tax. All facts stipulated in this case are incorporated herein by this reference. Opinion MURDOCK, Judge: The present case, consisting of two docket numbers involving the tax liability of Ruth, and another case, consisting of two docket numbers involving the tax liability of Mathias, were consolidated for the purpose of trial. Two exhibits, representing signed statements of Mathias made in October 1949, were admitted as admissions against interest only in the Mathias case. They were not admitted as a part of the record in the present case. Those two exhibits have not been considered in deciding the issues in the present case. However, direct first-hand testimony properly admitted and admissible in the case of the present petitioners, independently establishing some facts which are also shown by those exhibits, has been considered along with the other evidence in this case. There are two issues for decision in this case, one whether the Commissioner erred in determining the deficiencies and the other whether a part of each deficiency was due to fraud with intent to evade tax. The burden of proof on the first *269 issue is upon the taxpayers. Louis Halle, 7 T.C. 245, affd. 175 Fed. (2d) 500, certiorari denied 338 U.S. 949. The petitioners have failed to sustain that burden. It has been stipulated that the sales of merchandise from Ruth's hardware store were understated on the books of the business and on her returns in certain amounts. Ruth also admits that she received from the sales to Bell $30 per week in the beginning and increasing larger amounts thereafter. She testified that the amounts thus retained were rung up as sales from her hardware store but that statement is untrue. A small amount was paid to Miller for hauling the goods from the Cincinnati Galvanizing Company to the place where Ruth had her rendezvous with Bell and the tax treatment of those payments is not disputed herein. It is clear that the remainder of the large amounts which Ruth received from Bell for the galvanized ware was divided between Ruth and Mathias and was not reported by either. Ruth testified that she turned over most of that balance to Mathias whereas Mathias clearly implies by his testimony that the division was strongly in favor of Ruth. They both failed to tell *270 the whole truth as they had sworn they would. The Commissioner, in determining the deficiencies, has properly held that Ruth and Mathias each received approximately one-half of that money. Ruth testified that she cashed checks for Bell on occasions and she claims that some of those checks have been listed among those representing purchase of the galvanized ware. She kept no records of the sales to Bell or of the checks received and must suffer the consequences of that fault. Cf. Spies v. United States, 317 U.S. 492. She could not identify any check as one which was cashed merely as an accommodation. Bell also testified that Ruth had cashed a few checks for him but he could not identify any such check. The check relied upon by the Commissioner to show purchases of the galvanized ware for him were not the only ones given by Bell to Ruth and whatever checks she cashed for him may have been other checks rather than any of those relied upon by the Commissioner to show the wrongful sales to Bell. Furthermore, we are unable to give full credence to Ruth's testimony under oath, in the light of all of the evidence and observance of her during the course of the trial, nor was *271 Bell a convincing witness on this point. The Commissioner's figures should not be reduced upon the theory that a small portion of the total was not for galvanized ware but merely representing the cashing of a few checks for Bell. The Commissioner has the burden of proof to show by clear and convincing evidence that a part of the deficiency for each year was due to fraud with intent to evade tax. However, proof that Ruth received every cent of the amount which he has added to her income in determining the deficiencies is not necessary. It is sufficient, in relation to amounts, that he show the receipt by her of substantial amounts of unreported income in each of the years in question. Estate of W. Y. Brame, 25 T.C. - (1-19-56). He has done that, even though a few checks may have been only accommodations. It was stipulated that the sales of merchandise from Ruth's store for the years 1944, 1946, 1947, 1948 and 1949 were understated on the books of the business and on her returns, and it is clear from the evidence that she received in addition large amounts of income in each taxable year from the sales to Bell, none of which were shown on her books or reported on her returns. Ruth had *272 ample intelligence to know exactly what she was doing at all times material hereto. The receipt of large amounts of unreported income over a long period of time under circumstances as disclosed by this record is strong evidence of a fraudulent intent to evade taxes. M. Rea Gano, 19 B.T.A. 518, 533; Henry C. Boucher, 18 T.C. 710. Ruth claims that there is no proper proof of the amounts received from Bell during the period up to June 1947 in which period payments were made by cash. She says that the only evidence of amounts of merchandise or of money involved in those earlier years is represented by the two exhibits which were not admitted in evidence in her case. They were admissions made by Mathias shortly after the discovery of the scheme. Those exhibits have not been relied upon in this case for this or any other purpose. Evidence properly admitted in this case shows that the transactions during the earlier taxable years were not substantially different, in the amounts of merchandise or the amounts of money involved, from those in the later years. The evidence is quite clear that Ruth and Mathias were engaged in these unlawful operations during every one *273 of the taxable years. They both admit that. Ruth testified that she began receiving about $30 a week in those earlier years and the amount gradually increased to about $80 a week as the years went on. However, the evidence as a whole shows that she retained much larger portions of the total payments and did not report any of them. Mathias testified that the amounts involved in the earlier years were about the same as those in the later years. The size and frequency of the loads indicate large sales in all years. The evidence is clear and convincing that Ruth received large amounts of money in those earlier years just as in later years, which amounts she failed to report on her income tax returns. The evidence as a whole fully justifies the finding that a part of the deficiency for each year was due to fraud with intent to evade tax. Decisions will be entered under Rule 50. Footnotes
*. Joint returns of Ruth and Chester Bennett.↩